IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| REUEL RAY, | § | |
| | § | No. 197, 2021 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No.   1210020570A(N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted:   April 6, 2022
Decided:     July 1, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en banc*.

Upon appeal from the Superior Court.  **REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**

Benjamin S. Gifford IV, Esquire, Wilmington, Delaware, *for Appellant Reuel Ray*.

Matthew C. Bloom, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice, for the Majority:

On May 21, 2012, at approximately 7:30 p.m., Craig Melancon was felled by three gun shots, one from a .22 caliber firearm and the two others from what appeared to be a .38 caliber revolver. An hour later, Melancon was pronounced dead at the hospital.

The shooting occurred outside the home of a friend, who found Melancon lying on the ground and struggling for his life. The friend, Anthony Coursey, and another bystander, Marla Johnson, saw two hooded individuals running from the scene. Coursey later identified one of the fleeing men as Reuel Ray.

Ray was charged with, and ultimately convicted of, felony murder, attempted robbery, and related crimes, for which he received a life sentence plus 20 years. He appealed those convictions to this Court, claiming that the trial court erred by: (1) not granting a mistrial after a juror expressed concerns for her safety, and (2) not providing the jury with certain cautionary instructions, neither of which Ray requested, following the denial of Ray's mistrial request. In July 2017, this Court affirmed Ray's convictions.

Soon after that, Ray moved for postconviction relief under Superior Court Criminal Rule 61 and, in due course, his appointed counsel filed an amended Rule 61 motion. In his amended motion, Ray claimed that he was entitled to an evidentiary hearing and postconviction relief for three reasons. First, he argued that

2

the State's failure to disclose that, approximately one month before Ray's trial, it had dismissed a criminal charge then pending against a key prosecution witness violated his due process rights under *Brady v. Maryland*.[1] Had Ray been armed with knowledge of this dismissal, he believes that it is reasonably probable that he could have demonstrated the witness's bias and gained an acquittal. Next, Ray claimed that his trial counsel's inadequate pretrial investigation, which failed to uncover the witness's pending charge and its eventual dismissal, constituted ineffective assistance of counsel in violation of Ray's right to counsel and due process. Finally, Ray asserted that his counsel failed to provide effective representation at trial and on appeal by allowing an obviously flawed jury instruction on the elements of felony murder to guide the jury's deliberations.

The Superior Court rejected each of Ray's arguments and denied the amended Rule 61 motion.[2] In his appeal to this Court, Ray has abandoned his claim that his trial counsel mounted a constitutionally ineffective investigation but maintains his *Brady* claim and his ineffective-assistance claim as it relates to the court's felony-murder instruction.

In this opinion, we conclude that the Superior Court's erroneous felony-murder instruction—an instruction that, by everyone's lights, does not embody an

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).
[2] *State v. Ray*, 2021 WL 2012499 (Del. Super. Ct. May 19, 2021).

3

accurate statement of the law—and Ray's counsel's failure to object or to raise the error on direct appeal warrant the entry of postconviction relief in the form of a new trial on the felony-murder charge and the related firearm charge. We reject, however, Ray's contention that the State's *Brady* violation justifies relief as to all his convictions. Because those convictions were not influenced by the flawed felony-murder instruction and are supported by abundant evidence independent of the putatively biased witness's testimony, we remain confident in them.

## I

## A

During the afternoon of May 21, 2012, Ray had a phone conversation with his brother Richard, who was detained at Howard R. Young Correctional Institution in default of $50,000 secured bail. Ray told his brother that if he could "hit a lick," that is, commit a robbery, he "could put that money up" for Richard's bail.[3] A few minutes before 9:00 that evening—about an hour and a half after Melancon was shot and killed—the Ray brothers had a follow-up conversation on the phone. Ray then reported to Richard that he tried "to hit a lick," but it didn't work out as planned.[4] According to Ray, "[i]t just happened. You are going to read about it tomorrow. He got checked out."[5] According to the prosecution, the first of these conversations

---

[3] State's Ex. 16.
[4] State's Ex. 17.
[5] *Id.*

4

describes the Rays' hatching of a plan to commit robbery, and the second describes how that plan went awry and devolved into the murder of Craig Melancon. This translation of Ray's slang was supported by the testimony of the detective in charge of the homicide investigation.[6]

Perhaps the most damning trial testimony came from Tyare Lee, Ray's co-defendant. Lee, who was 21 years old at the time of trial and Ray's friend since elementary school, had pleaded guilty a year earlier to an array of crimes, including second degree murder, for his role in Craig Melancon's murder.[7] Because of those guilty pleas, Lee was facing a possible sentence of life plus 77 years in prison, with a minimum mandatory prison sentence of 24 years.

Lee explained how he and Ray had encountered Melancon at a basketball court in the Southbridge section of Wilmington during the afternoon of May 21. Lee was carrying a .22 revolver in his waistband, while Ray was carrying a .38 revolver. Lee asked Melancon, who was known to sell marijuana for Anthony Coursey, if he might purchase some that day. Melancon then walked, along with Lee, Ray, a female, and a child, in the direction of Coursey's residence on Townsend Place. Melancon parted company with the others and was next seen by Lee coming out of

---

[6] *See*, *e.g.*, the testimony of Detective Michael Gifford of the Wilmington Police department at App. to Opening Br. at A277 ("Doing a lick means you are committing a robbery . . . checked out . . . means that someone has been killed.").

[7] On January 6, 2014, Lee entered pleas of guilty to murder in the second degree, attempted robbery in the first degree, conspiracy in the second degree, and two counts of possession of a firearm during the commission of a felony.

Coursey's front doorway. Right before that, Ray had told Lee that he intended to "get" Melancon, meaning he planned to rob him.[8]

As Melancon approached, Lee and Ray pulled out their guns, and Ray told Melancon not to move. Lee described what happened next: "[Melancon] was standing in front of us, and he went to reach -- I guess he was going into his pocket or something[.] I had a reflex. I pulled the trigger . . . [and] the gun went off."[9] In Lee's telling, Melancon did not fall after Lee's shot, but he turned around "facing away" from Lee and Ray.[10] Lee recalled that he started to run and as he ran, Ray fired his gun at Melancon "[a]bout four or five times."[11] Lee believed that Ray's shots hit Melancon, because he fell after the second round of shots. After Ray shot his gun, he turned and ran, following Lee.

Ray and Lee parted ways, and, soon after that, Lee flagged down a friend— Barry Miller—who was in his car heading to another section of Wilmington. Lee asked Miller for a ride to his residence, which was in the same general direction as Miller's destination. As the two proceeded out of Southbridge, they encountered Brandon Tann, who was riding a bicycle. Tann also hitched a ride with Miller, who testified that Tann appeared "scared" and possibly armed.[12] Miller dropped off Lee

---

[8] App. to Opening Br. at A342.
[9] *Id*. at A343.
[10] *Id*. at A344.
[11] *Id*.
[12] *Id*. at A249.

6

and Tann at their respective Wilmington residences, Lee first and then Tann. During this drive, Miller was unaware of the shooting of Melancon in Southbridge.

Lee did not speak again with Ray that day but ran into him the next day. In the following days, Ray helped Lee sell his .22 revolver. Lee also knew that Ray had sold his .38 revolver to Darren Lamotte.

Lamotte did not testify at Ray's trial, but the parties stipulated that, during the second week of June, Lee and Ray approached Lamotte and asked him if he wanted to purchase a gun for $400. In due course, Lee and Ray went to Lamotte's residence at 433 South Claymont Street and, "[w]hile in Lamotte's bedroom, Ray pulled a revolver handgun from his person and laid it on the bed."[13] Lamotte then took possession of the gun in exchange for $400. A couple weeks later, Lee and Ray asked Lamotte to return the gun, but he refused.

Other witnesses filled in details that were missing from Tyare Lee's account. For instance, the female who walked from the basketball court in the direction of Coursey's residence—Marla Johnson—recounted that she was at the court with her four-year-old grandson. Melancon, who had been dating Johnson's daughter, and two men wearing black hooded sweatshirts—"[o]ne . . . short and stubby" and the other "thinner [and] taller"—were also there.[14] Ray is 5'7" tall and weighs nearly

---

[13] *Id*. at A509.
[14] *Id*. at A214.

200 pounds, while Lee stands 6-feet tall and weighs 145 pounds. The two unidentified men chatted with Melancon and then, as Lee described, walked away from the court on Townsend Place.

Johnson and her grandson eventually parted ways with the three men. She went toward her residence, while the other three headed in the direction of Coursey's house. Johnson was at her house for "about a good five minutes"[15] when, as she was making a sandwich for her grandson, she heard four gunshots. She ran outside, finding Melancon lying on the ground, "clenching . . . the grass . . . , just really trying to hold onto life . . . ."[16] Johnson also saw the two previously described hooded men running away from the scene. Although Johnson did not identify either of the two men, she did confirm that they were the same two men who had walked with her, her grandson, and Melancon from the park.

Anthony Coursey confirmed that Melancon visited his house on Townsend Place in Southbridge shortly before the shooting. While Melancon was there, Coursey noticed Lee peeking from behind a nearby house as if he was "up to something."[17] After that, Coursey ordered a pizza, and, about ten minutes later, Melancon left the house. As the pizza was being delivered to Coursey at the back of his house, he heard five shots, causing him to run to the front of the house, from

---

[15] *Id*. at A216.
[16] *Id*. at A215.
[17] *Id*. at A228.

8

which he could then see Melancon on the ground. Coursey noticed that, while his friends and "another lady . . . [who was] living next door" went to the prone Melancon, Lee and Ray were running away. The police arrived ten to fifteen minutes later.

That was the last Coursey saw of Ray that day. But a few days later, Coursey encountered Ray and Lee at a nearby gas station. According to Coursey, Ray approached him and said, "I ain't mean to shoot your friend. . . . He was talking about taking over Southbridge. I shot him."[18]

Coursey was not the only person to whom Ray allegedly admitted that he had shot Melancon. In the days following the Melancon homicide—"[l]ike a week or a couple a days after"[19]—Jonda Tann saw Ray at a local store. Concerned about a rumor that her son Brandon "had something to do with"[20] Melancon's death, she asked Ray if he knew if that was true. Ray responded that he and Lee were "supposed to rob"[21] Melancon and that they shot him. Although Tann was interviewed by police approximately one month after Melancon's death, she did not report Ray's admission until September 2014—more than two years later.

---

[18] *Id.* at A229. On cross-examination, Coursey acknowledged that, when he was questioned by the police in early June 2012—two and a half weeks after the shooting—he did not tell them of his encounter with Ray at the gas station or Ray's admission. On that occasion, he did, however, identify Lee and Ray as the two individuals, both wearing black hoods, he saw running from the scene.

[19] *Id.* at A396.

[20] *Id.*

[21] *Id.*

Approximately three months after Tann's belated account and one month before trial, the State dismissed a felony charge that was pending against her. The State provided Ray a copy of the recording in which she recounted Ray's admission but did not disclose, before trial, the pendency and subsequent dismissal of Tann's felony charge.

Detective Michael Gifford, who headed up the Wilmington Police Department's homicide investigation, interviewed Ray in late June 2012. Before Detective Gifford identified his reasons for interviewing Ray, Ray volunteered that he knew what Gifford wished to discuss; he knew because "1001 people" had already approached him and asked: "Did you shoot that boy?"[22] Ray then claimed that he was at his mother's house when Melancon was shot. Not only did Ray say that he knew who the shooter was, but he also offered to arrange a meeting with the shooter "with the murder weapon,"[23] which he described as a .38 special. At first, Ray's identification of the shooter was vague but, in due course, he provided his name—Darren Lamotte. Ray also offered that Lamotte was living with his girlfriend on South Claymont Street. Armed with this information, the police obtained a search warrant for the South Claymont Street residence. Upon execution of the warrant, the police recovered a .38 caliber firearm.

---

[22] State's Ex. 35.
[23] *Id.*

10

The State also introduced evidence of Ray's attempt to recruit witnesses to testify falsely on his behalf. Included in this evidence was a letter Ray sent to a friend asking her to appear at trial and to testify that she was with Ray in the area and at the time of the shooting. Ray asked the friend "to say that story,"[24] which was that she and another friend were with Ray when they heard gunshots and observed "two tall boys"—Ray is short and stocky, while Lee and Brandon Tann are much taller—"running with hoods up."[25] At trial, the friend depicted Ray's "story" as "[m]e basically lying for him."[26]

The Deputy Chief Medical Examiner, Dr. Adrienne Sekula Perlman, determined that multiple gunshot wounds caused Melancon's death. During her autopsy, Dr. Sekula Perlman noted three penetrating gunshot wounds in Melancon's back, two on his left upper back and one on the right side of his lower back. She recovered bullets from each of the three locations. One of the bullets found in Melancon's upper back was a "small size, gray metal bullet,"[27] while each of the other two recovered bullets was described as "large size, gray metal, [and] . . . deformed."[28] The Delaware State Police firearms-and-tool-mark examiner opined that the larger bullets were either .38 or .357 bullets, and the smaller one was

---

[24] App. to Opening Br. at A499.
[25] *Id.*
[26] *Id.*
[27] State's Ex. 23 at 3.
[28] *Id.* at 3–4. The large bullet found in Melancon's left upper back was "slightly deformed"; the other large bullet was "deformed."

a .22 caliber bullet. Because of the damage suffered by the larger bullets, he could not conclude that they had been fired from the .38 revolver that the police recovered during the search of Darren Lamotte's residence.

B

Relying on this evidence, the State presented its theory of the case to the jury in simple and direct terms:

> Reuel Ray was out with a .38-caliber black revolver handgun. He was on the hunt. He was on the hunt for bail money to bail his brother Richard Ray out of jail. He was out in Southbridge armed, ready. He recruited the logical, natural choice Tyare Lee, identified their target, approached their targets, pulled guns on their target. Tyare shoots once. [The robbery] has gone wrong at that point.
>
> At that point, [Ray] decides to finish the job Tyare Lee accidentally started. He fired bullet, after bullet, after bullet, into the back of a fleeing man as he is trying to get away.[29]

By contrast, in its effort to sow reasonable doubt in the jurors' minds, the defense mounted a multi-pronged attack on the prosecution's evidence. First, the defense discounted the significance of Ray's telephone conversations with his imprisoned brother on the date of the homicide as well as his apparent efforts to solicit false testimony as he prepared for trial. The police and prosecution, according to Ray, misinterpreted the recorded phone conversations, and Ray's solicitation of false testimony, admitted to by Ray's counsel, was the product of Ray's poor judgment and frustration with the likely non-appearance of real witnesses who

---

[29] App. to Opening Br. at A512–13.

would otherwise have offered testimony favorable to Ray. The defense attempted to bolster his challenge to the meaningfulness of Ray's post-homicide conduct and comments by arguing that his direction of the police to the murder weapon pointed to Ray's innocence rather than to his guilt.

The defense then asked the jury to consider the absence of physical evidence linking Ray to the shooting, placing special emphasis on the apparent absence of Ray's DNA on the recovered .38 caliber firearm. In fact, the defense went so far as to suggest that the absence of DNA "exclude[d] Reuel Ray from being the shooter."[30]

But the dominant theme of the defense's argument to the jury was that, for a variety of reasons, the testimony of Anthony Coursey, Jonda Tann, and—most of all—Tyare Lee was unworthy of belief. Coursey, Ray argued, was a marijuana-addled drug dealer whose testimony was contrived to secure a reduction in drug charges he was facing. Jonda Tann was lying to protect her son Brandon. And Lee was unreliable because, as Ray's counsel put it bluntly: "He just lies."[31] Lee's propensity to fabricate was intensified, according to Ray, by his desire to avoid a life sentence—a goal accomplished by testifying for the prosecution and against Ray—

---

[30] *Id*. at A524.
[31] *Id*. at A526.

13

and his fear of Brandon Tann.  Ray closed by positing that it was Brandon Tann—and not he—who joined Lee in the shooting of Craig Melancon.[32]

C

As the prosecution's presentation of evidence neared its conclusion, the court convened a prayer conference to consider draft jury instructions as prepared and previously circulated by the court.  The draft instructions were not made part of the record in the Superior Court, but our review of the prayer-conference transcript leads us to conclude that, at the conference, there was no substantive discussion of the draft jury instruction on felony murder, as charged under Count IV of the indictment.[33]

The felony-murder instruction as read to the jury before its deliberation stated, in pertinent part, that:

---

[32] This theory does not account for the testimony of Marla Johnson that one of the two hooded individuals she saw running from the scene was "short and stubby," *id.* at A214, a description that fits Ray (5'7", 195 pounds) but not Lee (6'0", 145 pounds) or Tann (6'3", 187 pounds).

[33] *Id.* at A419:

> [THE COURT:] Next one technically would be the second murder charge.  Count IV.  I would put that after -- I would put that right after the Count I.  I would go out of order.
> [DEFENSE COUNSEL]:  I understand.
> THE COURT:  Felony murder, that brings us to this document that I handed to you.  This would be as to Count IV, under Delaware law, a person is guilty of Murder First Degree when in the course of committing a felony.  So let's go back to the first murder one.  See if there is anything that is duplicative.  One is intentional, one is reckless.
> [THE STATE]:  I don't think there's any overlap.
> THE COURT:  This gets added where I put it, after the first murder is the second murder.

After this exchange, the court and counsel moved on to other topics.

14

As to Count 4, under Delaware law, a person is guilty of Murder in the First Degree, when, *in the course of and in the furtherance of the commission or attempted commission of any felony . . .* or immediate flight therefrom, that person recklessly causes the death of another person.

In other words, in order to find the defendant guilty of Murder in the First Degree, you must find that each of the following three elements has been established beyond a reasonable doubt:

First, the defendant caused Craig Melancon's death; and

Second, the defendant acted recklessly; and

Third, Craig Melancon's death occurred in the course of and in furtherance of the defendant's commission of a felony.

In order to prove that the defendant "caused" Craig Melancon's death, the State must establish that Craig Melancon would not have died but for the defendant's conduct. . . .

*"In the course of" means that Craig Melancon's death occurred during the defendant's commission of a felony. "In furtherance of" means that Craig Melancon's death was caused by the defendant or his accomplice, who committed a felony.* The State does not have to prove that the defendant *or his accomplice* caused Craig Melancon's death for the purpose of committing a felony. If, after considering all the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements that I have just stated, on or about the date and at the place stated in the indictment, you should find the defendant guilty of Murder in the First Degree. If you find that the State has not proved every element of the offense beyond a reasonable doubt, then you must find the defendant not guilty of Murder in the First Degree.[34]

The substance of this instruction conformed generally with the then-extant

Delaware Pattern Criminal Jury Instruction 11.636(a)(2), entitled "**MURDER IN THE FIRST DEGREE [FELONY MURDER]**." But the pattern instruction was

---

[34] App. to Opening Br. at A457–58 (emphasis added); *see also id.* at A534.

based on the text of 11 *Del. C.* § 636(a)(2) as it existed before the Delaware General Assembly amended the felony-murder statute in 2004. Before that amendment, the statute provided that "[a] person is guilty of murder in the first degree when . . . *in the course of and furtherance of the commission or attempted commission of a felony, the person recklessly causes the death of another person.*"[35]

In response to a 2003 decision of this Court,[36] the General Assembly amended Section 636(a)(2) to provide that "[a] person is guilty of murder in the first degree when[,] . . . [w]*hile engaged in* the commission or attempt to commit, or flight after committing or attempting to commit any felony, the person recklessly causes the death of another person."[37] Thus, to prove felony murder in the first degree under post-2004 Section 636(a)(2), no longer must the prosecution prove that the reckless killing was "in furtherance of" the underlying felony.

Although the Superior Court's felony-murder instruction is central to Ray's present claim for post-conviction relief, the instruction flew under the radar at trial.

---

[35] 11 *Del. C.* § 636(a)(2) (emphasis added); 2004 Del. Laws Ch. 246 (S.B. 238) ("This Act updates the language used to define the crimes of felony murder in the Delaware criminal code. This Act eliminates the phrase 'in the course of and in furtherance of' a felony that currently appears in Delaware's felony murder statutes. This language is used in the felony murder statutes of only a few other states. The Act will instead adopt language defining felony murder which is similar to the language used by thirty-eight other states, and which is already used in the felony murder provisions of Delaware's death penalty statute.").

[36] In *Williams v. State*, this Court held that the statute's requirement that, to qualify as felony murder, the reckless killing must be "in the course of and in furtherance of the commission or attempted commission of a felony," meant two things: "that the murder occur *during* the felony and that the murder occur to *help move the felony forward.*" 818 A.2d 906, 911–12 (Del. 2003) (emphasis added).

[37] 11 *Del. C.* § 636(a)(2) (emphasis added).

Neither the prosecution nor the defense objected to the court's incorrect recitation of the elements of felony murder or the arguably troublesome references to accomplice liability. When the court asked Ray's lawyer who attended the prayer conference at which the proposed jury instructions were vetted and represented Ray on direct appeal to "file [an] affidavit[] pursuant to Rule 61(g) in regard to [Ray's postconviction relief] claims,"[38] he responded:

> Counsel acknowledges that the felony-murder instruction tracked the pre-2004 language and that no instruction on accomplice liability was sought or given. The felony-murder instruction given was derived from the criminal pattern instructions published and maintained by the Superior Court. Counsel's reliance upon the instruction was, evidently, misplaced.[39]

Counsel's affidavit does not address the failure to raise this issue on direct appeal.

D

The jury was asked to consider Ray's responsibility for the homicide of Melancon under two alternative theories. Under Count I of the indictment, Ray was charged with murder in the first degree for intentionally causing Melancon's death, while under Count IV he was charged with murder in the first degree for recklessly causing Melancon's death while engaged in the commission of, or attempt to commit, robbery in the first degree, *i.e.*, felony murder. The State also charged Ray with conspiracy in the second degree, alleging, among other things, that he had

---

[38] App. to Opening Br. at A26.
[39] *Id*. at A762–63.

17

agreed with Tyare Lee to rob Melancon. The jury acquitted Ray of intentional murder but convicted him of felony murder, two counts of possession of a firearm during the commission of felony murder, conspiracy in the second degree, attempted robbery, two counts of possession of a firearm during the commission of attempted robbery, and two counts of criminal solicitation in the second degree.[40]

After the Superior Court sentenced Ray to life in prison (mandated by statute) for felony murder and twenty additional years for the other convictions, he appealed to this Court. Represented by one of the two lawyers who represented him at trial, Ray raised two issues on direct appeal, neither of which questioned the propriety of the trial court's felony-murder instruction. As mentioned at the outset of this opinion, this Court affirmed Ray's convictions.

In a timely filed motion for postconviction relief under Superior Court Criminal Rule 61, Ray has mounted a collateral attack on his convictions, challenging the adequacy of his counsel's representation during trial and on direct appeal. More specifically, Ray claims that his lawyers, in violation of prevailing professional norms, failed to ensure that the trial court's jury instruction related to felony murder accurately stated the relevant law and also neglected to raise this inaccuracy on direct appeal. According to Ray, had his counsel alerted this Court

---

[40] At Ray's sentencing hearing, the State entered a *nolle prosequi* on two of the four firearm charges.

on direct appeal to the trial court's flawed instruction, we would have reversed his convictions and ordered a new trial. He now claims that such relief is appropriate under Rule 61.

The State concedes that the Superior Court's felony-murder instruction was "outdated,"[41] but argues that it was nevertheless "more than sufficient to correctly guide the jury"[42] in its consideration of the elements—and the adequacy of the prosecution's proof—of felony murder. Not surprisingly, the State's argument does not seek to justify counsel's failure to notice and object to the flawed instruction but, instead, urges us to conclude that the trial court's and trial counsel's missteps should not undermine our confidence in the outcome of Ray's trial.

Ray also contends that the Superior Court erred when it concluded that the State did not violate *Brady* by failing to disclose that Jonda Tann's pending felony charge had been dismissed after she gave her statement to police implicating Ray in Melancon's murder. The State concedes that it should have disclosed the dismissal of the charge against Tann to the defense, but counters that the Superior Court's denial of this claim was correct in light of "the State's other, independent evidence[, which] overwhelmingly established Ray's guilt."[43]

---

[41] Answering Br. at 35.
[42] *Id.* at 26.
[43] Opening Br. at 3.

## II

This Court reviews ineffective-assistance-of-counsel claims *de novo*.[44] The analytical framework under which we review such claims was established by the United States Supreme Court in *Strickland v. Washington* and, at its most basic level, is reducible to two steps.[45] "[T]o establish that his Sixth Amendment right to effective assistance of counsel was violated, [a postconviction relief movant] must show, first, that his counsel's representation fell below an objective standard of reasonableness and, second, that the deficiencies in counsel's performance caused him substantial prejudice."[46]

## A

It is beyond dispute that the Superior Court's felony-murder instruction did not reflect the 2004 amendment of the felony murder statute. But the court's departure from the current statutory text is not Ray's only objection to the instruction. He also points out that the court's explanation of the "in furtherance of" element—to repeat, at the time of Ray's trial, no longer a component of felony murder under Section 636(a)(2)—interjected the notion of accomplice liability into the jury's consideration of Ray's guilt. This is particularly problematic, according

---

[44] *Starling v. State*, 130 A.3d 316, 325 (Del. 2015) (citing *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013)).

[45] *Strickland v. Washington*, 466 U.S. 668 (1984).

[46] *Green v. State*, 238 A.3d 160, 174 (Del. 2020).

to Ray, because when the prosecutor asked the court, albeit after the parties' closing argument, to give a standard accomplice-liability instruction,[47] the court refused, finding that accomplice liability "wasn't argued, wasn't presented, [and] there is no record evidence of it . . . ."[48]

What is more, although the Court did not give an accomplice-*liability* instruction defining the contours of one's criminal liability for the conduct of another actor, it did provide an accomplice-*testimony* instruction. Among other things, the court reminded the jury that it had heard the testimony of "an admitted participant in the crime"—Tyare Lee—referring to him four times as "an alleged accomplice."[49] Thus, the court's *sua sponte* interjection of the potential for accomplice liability in the felony-murder instruction was accompanied by its identification of Lee as Ray's alleged accomplice in the accomplice-testimony instruction. But neither of these instructions—nor any separate accomplice-liability instruction—gave the jury any guidance as to how it was to determine whether Lee had acted, in fact, as Ray's accomplice.

---

[47] A typical accomplice liability instruction would track 11 *Del. C.* § 271, which is entitled "Liability for the conduct of another—Generally." For instance, Delaware Superior Court Criminal Pattern Jury Instructions 4.32 provides, in pertinent part, that "[t]he defendant is guilty of a crime committed by another person only when, with the intent to promote, facilitate, or assist the commission of the crime, the defendant either: solicits, requests, commands, importunes or otherwise attempts to cause the other person to commit the crime; or aids, counsels, or agrees or attempts to aid the other person in planning or committing the crime[.]"

[48] App. to Opening Br. at A531.

[49] *Id.* at A537.

To the Superior Court's credit, when it denied Ray's Rule 61 motion, it candidly acknowledged that its felony-murder instruction was "incorrect" and "did not accurately reflect the most recent statutory language for Felony Murder."[50] The court found that "[n]either the Court nor the State nor trial counsel noticed that the instruction was outdated and should have been updated to reflect the changes to the statute."[51] The court did not, however, find that this oversight by Ray's counsel constituted deficient performance under *Strickland*'s first prong. Instead, the court determined that Ray's failure to show prejudice under *Strickland*'s second prong was fatal to his ineffective-assistance claim, regardless of the adequacy of Ray's lawyer's performance.

B

Because, for reasons set forth later, we disagree with the Superior Court's prejudice analysis, we begin our *de novo* review of Ray's ineffective-assistance-of-counsel claim with an assessment of the objective reasonableness of counsel's failure to object to the incorrect felony-murder instruction. This assessment necessarily involves a brief discussion of the purpose of jury instructions and the roles that the trial court and counsel play in the instruction process.

---

[50] *Ray*, 2021 WL 2012499, at *10.
[51] *Id.*

22

In *Bullock v. State*, this Court observed that:[52]

> The primary purpose of jury instructions is to define with substantial particularity the factual issues and clearly to instruct the jury as to the principles of law [that] they are to apply in deciding the factual issues presented in the case before them. A trial court must give instructions to a jury as required by evidence and law whether the parties request the instruction or not. Indeed, the trial judge is charged with the responsibility for instructing the jury. This is not controlled by the parties as their function and duty is to bring to the court's attention the instructions they consider applicable and the reasons why they should be given.

And we have long recognized that, although a defendant is not entitled to an instruction of his choosing, "he does have the unqualified right to a correct statement of the substance of the law."[53] In the direct-appeal context, deficient jury instructions will provide grounds for reversal if the deficiency "undermine[s] the ability of the jury 'to intelligently perform its duty in returning a verdict.'"[54]

Here, the court's instructions do not pass muster under these standards. The trial court, the State, and the defense all concur that the felony murder instruction is not a correct statement of the post-2004 felony-murder statute. Moreover, the trial court's decision to introduce the concept of accomplice liability carried with it the responsibility for explaining that concept so that the jury could intelligently consider

---

[52] *Bullock v. State*, 775 A.2d 1043, 1047 (Del. 2001) (quotation marks, footnotes, and brackets omitted) (quoting *Zimmerman v. State*, 565 A.2d 887, 890–91 (Del. 1981) and *United States v. Cooper*, 812 F.2d 1283, 1286 (10th Cir. 1987)).

[53] *Flamer v. State*, 490 A.2d 104, 128 (Del. 1983).

[54] *Probst v. State*, 547 A.2d 114 (Del. 1998) (quoting *Storey v. Castner*, 314 A.2d 187, 194 (Del. 1973)).

its ramifications for Ray's guilt or innocence. Could it nevertheless be said that Ray's lawyer's failure to object to the instructions and, having thus failed, to raise the issue on direct appeal, met *Strickland*'s standard of objective reasonableness? We think not.

C

When evaluating the adequacy of counsel's representation in the face of an ineffective assistance of counsel claim, this Court has hewed closely to the principles the United States Supreme Court laid down in *Strickland*.[55] As mentioned, to prevail on an ineffective-assistance claim, a defendant must first show that "counsel's representation fell below an objective standard of reasonableness."[56] Counsel's performance is entitled to a strong presumption that it was reasonable. *Strickland* teaches further that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate that conduct from counsel's perspective at the time."[57] The reasonableness of counsel's challenged conduct must be judged on the facts of the particular case. A determination that defense counsel's conduct was "the result of reasonable professional judgment" or

---

[55] *See, e.g.*, *State v. Flowers*, 150 A.3d 276, 282 (Del. 2016); *Rodriguez v. State*, 109 A.3d 1075, 1079 (Del. 2015): *Somerville v. State*, 703 A.2d 629, 631 (Del. 1997).
[56] *Strickland*, 466 U.S. at 687–88.
[57] *Id*. at 689.

"within the wide range of professional competent assistance" will defeat an ineffective-assistance claim.[58]

Under these principles, a lawyer's decision to refrain from objecting to a faulty jury instruction or requesting a clarifying one can be perfectly reasonable if it is the product of reasonable professional judgment and strategic considerations. But that did not happen here. In the affidavits Ray's counsel submitted in these Rule 61 proceedings, neither of the lawyers who represented Ray at trial or on direct appeal claims to have noticed that the instruction was inaccurate and referred to potential accomplice liability. It seems obvious that, as the Superior Court found, none of the key actors in Ray's trial—not the trial judge, not the prosecutors, and not the defense lawyers—noticed that the instruction was outdated. It is equally clear that no one compared the felony-murder instruction to the felony-murder count—Count IV—in the indictment or the text of the applicable felony-murder statute.

Thus, defense counsel did not bring their professional judgment, reasonable or otherwise, to bear on this issue. As a consequence of this failure and as will be developed more fully below, the jury instruction that would guide the jury's consideration of Ray's guilt on the felony-murder count, conviction under which

---

[58] *Id*. at 690.

carried the life sentence Ray is now serving, contained an incorrect statement of the law, a fact that a reasonably competent attorney should have recognized.[59]

In addition, the instruction introduced a theory of criminal liability, *i.e.*, accomplice liability, that ran contrary to the defense's theory of the case. What is more, according to the trial judge, there was "no record evidence" supporting this theory of liability.[60] It follows in our view—and on this point neither the trial court nor the State (except in the most conclusory fashion) effectively engaged, focusing instead on *Strickland*'s prejudice prong[61]—that trial counsel's failure to object to the instruction was objectively unreasonable.

Likewise, it was objectively unreasonable for Ray's counsel to forgo raising the deficiency of the felony-murder instruction on direct appeal. Only one of the two lawyers who defended Ray at trial represented him in his direct appeal to this Court. His affidavit does not respond to Ray's claim that he was ineffective for not identifying the issue on direct appeal. We are left to assume, therefore, that just as counsel did not notice the instruction's flaw during Ray's trial, his ignorance of the defect persisted through Ray's direct appeal. Put another way, counsel's decision

---

[59] *See Smith v. State*, 991 A.2d 1169, 1174 (Del. 2010) ("A reasonably competent attorney patently is required to know the state of the applicable law." (quoting *Everett v. Beard*, 290 F.3d 500, 509 (3d Cir. 2002))).

[60] App. to Opening Br. at A531.

[61] The gist of the State's argument regarding the adequacy of counsel's performance was that the felony-murder instruction was not deficient. Therefore, according to the State, "Ray's counsel did not perform deficiently by failing to request an instruction in a different form . . . ." Answering Br. at 29.

26

not to raise the issue on appeal was not the product of a considered judgment about its merit. Because the instruction was so obviously incorrect and this issue was clearly stronger than those Ray's counsel actually presented on appeal, we conclude that Ray has overcome the presumption that his counsel was effective on appeal.

D

As we have noted above, the Superior Court rejected Ray's ineffective assistance claim not because it found his lawyers' performance to have been objectively reasonable but, rather, because it concluded that Ray was not prejudiced by the erroneous instruction at trial. The basic premise of the court's conclusion was that the outdated instruction "placed a higher burden on the State to establish [Ray's] guilt beyond a reasonable doubt for Felony Murder than was required by the post-amendment, applicable version of the statute."[62] Under the court's reasoning, this cured both the court's recitation of an element of felony murder that was no longer in the felony-murder statute *and* its reference to accomplice liability. This premise, coupled with the applicability of the plain-error review standard that would presumably be applied on appeal because of trial counsel's failure to object to the instruction, also formed the underpinning of the Superior Court's conclusion that Ray's counsel was not ineffective on appeal. We disagree with the Superior Court's prejudice analysis.

---

[62] *Ray*, 2021 WL 2012499, at *10.

27

"To demonstrate prejudice caused by counsel's ineffectiveness, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[63] When the probability is such that our confidence in the proceeding's outcome is undermined, we will find prejudice.[64] This framework applies to our review of claims of ineffective assistance of counsel at trial and on appeal.[65]

Although we are confident that the trial court would have brought its felony-murder instruction into compliance with the operative statute upon a timely objection from defense counsel, we cannot say with certainty whether the court would have then given a proper accomplice-liability instruction, as our precedent requires, or if the court would have decided to strike all references to the accomplice-liability theory from the instructions. The latter outcome—deletion of the accomplice-liability references—would have benefitted Ray's defense. It is plausible that the court would have chosen that alternative given that, when the State requested an accomplice-liability instruction, the court responded that the theory "wasn't argued, wasn't presented, [and] there is no record evidence of it . . . ."[66] Indeed, this exchange presented defense counsel with yet another opportunity that it

---

[63] *Green*, 238 A.3d at 174 (quoting *Starling*, 130 A.3d at 325).
[64] *Starling*, 130 A.3d at 325 (quoting *Strickland*, 466 U.S. at 694).
[65] *Neal v. State*, 80 A.3d 935, 946 (Del. 2013).
[66] App. to Opening Br. at A531.

28

did not take advantage of: counsel could have credibly argued that, according to the trial court's own statements, no references to accomplice testimony or liability were appropriate. Succeeding on this objection would have undoubtedly been beneficial to Ray's defense against the felony-murder charge, especially considering that Ray was charged with, and acquitted of, intentional murder. Put differently, the jury did not agree that Ray intentionally and singlehandedly caused Melancon's death. For this reason, we are not confident that, absent the trial court's incomplete invocation of accomplice liability, the jury would have unanimously agreed to convict Ray of felony murder.

What is more, the failure of Ray's counsel to notice and flag the problematic jury instruction extended beyond Ray's trial and into Ray's direct appeal. We turn next to the effect of the failure of Ray's appellate counsel to bring the error to this Court's attention on direct appeal.

E

Because Ray's trial counsel did not object to the flawed felony-murder instruction at trial, had he raised it on direct appeal, we would have reviewed the argument for plain error. Under that standard, "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[67] Applied here, this means that Ray must show a reasonable

---

[67] *Wainwright v. State*, 504 A. 2d 1096, 1100 (Del. 1986).

probability that, had his appellate counsel pointed out the trial court's mistake on direct appeal, he would have prevailed under the plain-error standard of review.[68]

The question thus framed then is whether there is a reasonable probability that, had this court been apprised of the fact that Ray's felony-murder conviction rested on a jury instruction that, in addition to being outdated and incorrect, referred to potential accomplice liability without defining that concept, this Court would have reversed Ray's conviction. We are confident that we would have. Ray is therefore entitled to postconviction relief.

The jury instruction was likely to have an adverse effect on the jury's understanding of felony murder as defined by 11 *Del. C.* § 636(a)(2) for several reasons. First—and most obviously—the instruction as actually given did not accurately track the elements of the offense as defined by the then-operative statute. Although the Superior Court attempted to play down the significance of the instruction's departure from the statute and even suggested that the mistake redounded to Ray's benefit, we see it differently. To be sure, telling the jury that an element of the offense was the causing of death "in the course of . . . the defendant's commission of a felony" (the instruction as given) is close to telling the jury, in

---

[68] *See Neal*, 80 A.3d at 947 (when an argument is not preserved or raised at trial, to prevail on a claim of ineffective assistance of appellate counsel, "the defendant must show a reasonable probability that his appellate counsel would have prevailed on direct appeal under a plain error standard of review").

30

accordance with the post-2004 statute, that the murder must occur "while engaged in" the commission, attempt to commit or flight from the commission or attempt to commit a felony. The trial court, indeed, instructed the jury that "'[i]n the course of' means that Craig Melancon's death occurred during the defendant's commission of a felony."[69] Thus, "in the course of" could reasonably be understood as meaning "while engaged in."

But the instruction also retained the "in furtherance of'" language from the pre-2004 statute and explained that "'[i]n furtherance of' means that Craig Melancon's death was caused by the defendant or his accomplice, who committed a felony."[70] This explanation was incorrect even under the pre-2004 statute, under which "in furtherance of" was interpreted to mean that the murder must have facilitated commission of the felony, or "help[ed] to move the felony forward."[71]

The instruction also improperly cleared a new path to a finding that Ray was guilty of first-degree murder. In particular, the instruction told the jury that Ray

---

[69] App. to Opening Br. at A457–58 (emphasis added); *see also id.* at A534.

[70] App. to Opening Br. at A457–58.

[71] *Williams*, 818 A.2d at 913. The Superior Court's instruction here appears to have been fashioned after *Chao v. State*, 604 A. 2d 1351 (Del. 1992). But, in *Williams*, we overruled the relevant portion of *Chao*. *Williams*, 818 A.2d at 913 ("To the extent that the *Chao* opinion states that 'in furtherance of' language of the statute addresses solely the identity of the person who is committing the actual killing, it is overruled. Accordingly, we . . . hold that the felony murder language requires not only that the defendant, or his accomplices, if any, commit the killing but also that the murder helps to move the felony forward."); *see also Comer v. State*, 977 A.2d 334, 339–40 (Del. 2009).

could be held responsible for first-degree felony murder even upon a finding that he had not caused Melancon's death if it determined that his "accomplice" had done so.

This portion of the felony-murder instruction is fundamentally in conflict with the trial judge's statement, when asked by the prosecution to instruct the jury on the principles of accomplice liability, that there was no evidentiary basis for such an instruction. This contradiction, standing alone, is sufficient to support our determination that the instruction jeopardized the fairness and integrity of Ray's trial.

Not surprisingly, Ray agrees with the trial court's conclusion that an accomplice-liability instruction was not supported by the record; if that conclusion is correct, it was unreasonable and necessarily confusing for the court to identify Lee as Ray's accomplice and tell the jury that Ray was responsible for Lee's conduct. But our concern over the trial judge's references to accomplice liability is not dependent upon its questionable conclusion that "there [was] no record evidence" of a principal/accomplice relationship between Ray and Lee.[72] The problem, in our view, with the trial court's references to an accomplice—references that in context unmistakably referred to Lee—and its instruction that Ray could be found guilty if

---

[72] App. to Opening Br. at A531. The trial court's conclusion appears to ignore Lee's testimony from which the jury could infer that Lee aided or attempted to aid Ray in the attempted robbery of Melancon and Jonda Tann's testimony that Ray had admitted to her that he and Lee intended to rob Melancon. It also cannot be squared with the court's giving of an "accomplice testimony" instruction in which Lee was referred to, albeit indirectly, as "an alleged accomplice." *Id*. at A537.

Ray's accomplice caused Melancon's death, is that the court did not instruct the jury on the principles relevant to accomplice liability.

As this Court held in *Johnson v. State*, when a prosecution proceeds on a theory of accomplice liability, Sections 271 and 274 of the Delaware Criminal Code require the jury to apply a two-step analysis.[73] "First the jury must decide whether the State has established that the defendant was an accomplice to a criminal offense committed by another person."[74] To assist the jury performing this step, the trial court should tell the jury what it means to act as an accomplice under Section 271.[75] As one Superior Court pattern instruction explains:

> A person charged with a crime may be convicted as a principal for acts that the person personally committed, or as an accomplice for aiding the principal in committing the crime.
>
> A person is guilty as an accomplice, that is, guilty of a crime committed by another person when, with the intent to promote or facilitate the commission of the crime, the person either solicits, requests, commands or otherwise attempts to aid the other person in planning or committing the crime: or aids, counsels, or agrees or attempts to aid the other person in planning or committing the crime.[76]

Second, if the jury finds the existence of a principal/accomplice relationship between two actors for an offense that is divided into degrees, as is the case for homicide,[77]

---

[73] *Johnson v. State*, 711 A.2d 18 (Del. 1998).

[74] *Id.* at 30.

[75] *Id.*

[76] Delaware Pattern Criminal Jury Instruction § 4.34.

[77] Under the Delaware Criminal Code, the possible degrees of guilt are murder first degree, murder second degree, manslaughter, and criminally negligent homicide.

the jury must then determine what degree of the offense the defendant committed. This step is mandated by 11 *Del. C.* § 274, which provides:

> When, pursuant to § 271 of this title, 2 or more persons are criminally liable for an offense which is divided into degrees, each person is guilty of an offense of such degree as is compatible with that person's own culpable mental state and with that person's own accountability for an aggravating fact or circumstance.

In *Johnson*, we stressed that this second step must be based on "an *individualized* determination of the defendant's mental state and culpability for any aggravating factor or circumstances."[78]  Here, the Superior Court did not spell out these principles for the jury's consideration.  By failing to do so, the court undermined the jury's ability to intelligently decide factual issues that, according to the court's felony-murder instruction, could form a predicate of a felony-murder conviction.  This further shakes our confidence in the fairness and integrity of Ray's trial and reinforces our conclusion that, had Ray's appellate counsel raised this issue on direct appeal, we would have found plain error and reversed Ray's felony-murder conviction and, along with it, the conviction for possession of a firearm during the commission of felony murder.  Hence, Ray has demonstrated that he is entitled to postconviction relief as to that conviction.

---

[78] *Johnson*, 711 A.2d at 30 (emphasis in original).

III

Because the erroneous felony-murder instruction was unlikely to have affected the jury's consideration of the remaining counts of the indictment, we must also address Ray's *Brady* claim. "We review questions of law and constitutional claims, such as claims based on the State's failure to disclose exculpatory or impeaching evidence, *de novo*."[79]

A

Under *Brady* and its progeny, the prosecution in criminal proceedings "has a constitutional obligation to disclose exculpatory and impeachment evidence within its possession to the defense when that evidence might be material to the outcome of the case."[80] The *Brady* rule is violated when "(1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the state; and (3) its suppression prejudices the defendant."[81] And this Court has held that

> [i]n order for the State to discharge its responsibility under *Brady*, the prosecutor must disclose all relevant information obtained by the police or others in the Attorney General's Office to the defense. That entails a duty on the part of the individual prosecutor to 'learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'[82]

---

[79] *Risper v. State*, 250 A.3d 76, 87 (Del. 2021).
[80] *Brady*, 373 U.S. at 91.
[81] *Starling*, 882 A.2d at 756 (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).
[82] *Wright v. State*, 91 A.3d 972, 988 (Del. 2014) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)).

Here, the State, in effect, concedes that it should have disclosed to the defense that one of its witnesses benefited from the State's dismissal of charges against her shortly before Ray's trial. Instead, like the Superior Court, the State focuses on Ray's inability to demonstrate that he suffered prejudice as a consequence of the non-disclosure.[83] We therefore train our attention on the materiality of the withheld evidence to Ray's trial.

B

In the *Brady* context, to demonstrate prejudice or materiality, "the defendant must show that the State's evidence creates a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[84] Such a reasonable probability exists when the withholding of exculpatory or impeaching evidence undermines confidence in the outcome of the trial.[85]

---

[83] Answering Br. at 11 ("[T]he State has an obligation to disclose whenever it reduces charges against one of its witnesses. In this case, the Superior Court found that the State did not disclose to Ray that it had dismissed the charges against Tann. The suppression of such impeachment evidence, even if inadvertent, might establish both cause under Rule 61(i)(3) and the first two elements of *Brady*." (footnotes omitted)).

[84] *Wright*, 91 A.3d at 988 (emphasis in original) (quoting *Starling*, 882 A.2d at 756).

[85] *Id.*; *see also Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").

## C

The principal theme of Ray's prejudice argument is that the defense's cross-examination of Tyare Lee and Anthony Coursey was so effective as to make the acceptance of Jonda Tann's testimony essential to the jury's guilty verdicts. According to Ray, the withholding of evidence with impeachment value—that Tann was the beneficiary of favorable treatment by the State and therefore biased in its favor—drastically undermined Ray's ability to persuade the jury that Tann should not be believed. Ray also argues that the Superior Court applied a legally incorrect materiality analysis, that is, that the court applied a "sufficiency of the evidence" test rather than the materiality test we have described above. We disagree with Ray on both counts.

Ray's first argument depends on the premise that Lee and Coursey were so lacking in credibility that the jury's verdict must have hinged on its acceptance of Tann's testimony that Ray had told her that he and Lee intended to rob Melancon and shot him. It also assumes that, had the jury known that Tann's felony charge was dismissed one month before Ray's trial, it would have rejected her testimony as the product of bias. It is reasonably probable, according to Ray, that the jury in turn would have rejected the eyewitness testimony of Lee, Coursey, and Marla Johnson, ignored the recorded phone calls between Ray and his brother and his efforts to

solicit false testimony, and disregarded Ray's connection to the .38 revolver, which he himself described as the murder weapon.

In the first place, we do not accept Ray's conclusion that Lee's and Coursey's testimony was so unreliable as to render it a nullity. To be sure, defense counsel mounted an effective cross-examination of both and argued to the jury why their testimony, self-serving and arguably inconsistent as it was, should be rejected. But Lee's testimony lined up accurately with Marla Johnson's testimony and the forensic evidence. And though defense counsel's cross-examination of Coursey was effective, exposing that his initial statement to police omitted Ray's admission and that he had received a plea bargain on drug charges before testifying, it was hardly devastating. In sum, we cannot conclude on the record before us that it is reasonably probable that, had the evidence of the dismissal of Tann's felony charge been disclosed to the defense and then put before the jury, the result of Ray's trial would have been different.

We also disagree with Ray's contention that, in rejecting his *Brady* claim, the Superior Court applied a "sufficiency of the evidence" test rather than the correct *Brady* materiality standard. It is the case that the Superior Court considered the strength of the State's case and it is implicit that it did so in relation to evidence independent of Jonda Tann's testimony. It found that evidence "extensive"[86] and

---

[86] *Ray*, 2021 WL 2012499, at *6.

38

"overwhelming."[87] That is not a "sufficiency of the evidence" test, which typically determines whether evidence, viewed in a light most favorable to the prosecution, is sufficient to demonstrate to a reasonable factfinder that the defendant is guilty beyond a reasonable doubt.[88] Ray's contention on this point is without merit.

IV

Our consideration of Ray's claims has yielded mixed results—a reversal of the Superior Court's denial of postconviction relief from Ray's felony-murder conviction and the attendant firearm convictions while affirming his other convictions. The Superior Court's felony-murder jury instruction was so flawed that it would have warranted a reversal of Ray's felony-murder conviction had the issue been flagged on direct appeal even under the plain error standard of review. We are confident that a majority of this Court would not have placed its stamp of approval on a conviction—much less one that condemns the defendant to life in prison—that rests on a jury instruction that misstates the elements of the crime of conviction in a material way and introduces a theory of liability without explaining that theory to the jury.

---

[87] *Id*. at *7.

[88] *Williamson v. State*, 113 A.2d 155, 158 (Del. 2015) (the standard of review of the sufficiency of evidence in a criminal case is "whether *any* rational trier of fact, viewing the evidence in the light most favorable to the State, could find [a] defendant guilty beyond a reasonable doubt." (quoting *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995) (emphasis in original)).

To be clear, however, we do not hold that it is reasonably probable that, had Ray's jury been properly instructed, he would have been acquitted of felony murder. As our recitation of the prosecution's case and our treatment of Ray's *Brady* claim should suggest, the evidence against Ray was sufficient to support a conviction for felony murder beyond a reasonable doubt by a well instructed jury. But all persons who stand accused of crime, even—and perhaps especially—those against whom the evidence is strong, have the right to effective representation before a jury guided by a correct statement of the law. Because Ray was deprived of that right, his request for relief from his felony-murder conviction and the related firearm conviction should have been granted. Yet because we are satisfied that the erroneous instruction did not infect the jury's consideration of the counts other than felony murder and that Ray was not prejudiced by the State's non-disclosure as discussed above, we remain confident in the jury's verdicts on those counts.

For these reasons, we reverse in part the Superior Court's denial of Ray's motion for postconviction relief, vacate his convictions for felony murder (Count IV) and possession of a firearm during the commission of felony murder (Count V) and remand for a new trial on those counts. We affirm the Superior Court's judgment as to Ray's other convictions.

40

**VAUGHN**, Justice, concurring in part and dissenting in part:

I concur in the Majority's rejection of the defendant's *Brady* claim. I dissent because I believe the defendant has failed to establish prejudice from the use of the obsolete felony-murder instruction.

The old, pre-amendment instruction informed the jury that in order to find the defendant guilty of felony-murder, it must find that the State had established three elements beyond a reasonable doubt: (1) that the defendant caused the death of Craig Melancon; (2) that the defendant acted recklessly; and (3) that the victim's death occurred in the course of and in furtherance of the defendant's commission of a felony.

If the current, correct version of the instruction had been given, it would have instructed the jury that in order to find the defendant guilty of felony-murder, it must find that the State had established the following three elements beyond a reasonable doubt: (1) that the defendant caused the death of Craig Melancon; (2) that the defendant acted recklessly; and (3) that the defendant caused the victim's death while engaged in the commission of a felony.

The change in the third element—from "in the course of and in furtherance of the defendant's commission of a felony" to "while engaged in the commission of a felony"—was brought on by this Court's decision in *Williams v. State*.[89] In that case,

---

[89] 818 A.2d 906 (Del. 2003).

this Court held that the phrase, "in the course of and in furtherance of" the commission of a felony "requires not only that the defendant, or his accomplices, if any, commit the killing but also that the murder helps to move the felony forward."[90] The synopsis of the 2004 amendment to the felony-murder statute cited *Williams* with disapproval and rejected the *Williams* requirement that the evidence show that the killing facilitated the underlying felony or helped move it forward.  The new language, "while engaged in the commission of a felony," the synopsis explained, meant "only that the killing must be directly associated with the predicate felony as one continuous occurrence."[91]  The Superior Court in this case found that the pre-amendment language, requiring that the victim's death occur "in the course of and in furtherance of" the commission of the felony, placed a "higher burden"[92] of establishing guilt on the State than the post-amendment version, which requires only that the defendant caused the victim's death "while engaged" in the commission of the felony.  I agree with the Superior Court's finding on that point.  I think that the jury's finding that the defendant caused the victim's death "in the course of and in furtherance of" the felony necessarily means that the jury was convinced that the defendant caused the victim's death "while engaged" in the commission of the

---

[90] *Id.* at 913.

[91] *Comer v. State*, 977 A.2d 334, 338 (Del. 2009) (quoting the synopsis of the bill amending the felony-murder statute).

[92] Opening Br. Ex. A at 28.

42

felony. There is ample evidence in the record to support this conclusion. Therefore, as regrettable as it is that the trial judge gave the old instruction, I do not see that in this case it caused the defendant any prejudice as required by *Strickland*.

The defendant also contends that the instruction allowed the jury to decide the case on an accomplice liability theory without an accomplice liability instruction. This contention is based upon the reference to an accomplice in two sentences in the instruction. Those sentences read: "'In furtherance of' means that Craig Melancon's death was caused by the defendant, or his accomplice, who committed a felony. The State does not have to prove that the defendant or his accomplice caused Craig Melancon's death for the purpose of committing a felony."[93]

The instruction also informed the jury that in order to find the defendant guilty, it "must find that each" of the three elements of the offense was established beyond a reasonable doubt. The first element was that "the defendant caused the death of Craig Melancon." The instruction further informed the jury that "In order to prove that the defendant caused Craig Melancon's death, the State must establish that Craig Melancon would not have died but for the defendant's conduct."[94] The jury's verdict of guilty means that the jury found that this first element was established beyond a reasonable doubt, which means that the jury found that the

---

[93] App. to Opening Br. at A534.
[94] *Id.*

43

defendant, by his conduct, caused the death of the victim.

The jury was not given an accomplice liability instruction that would have allowed it to find that the first element of the felony-murder instruction could be satisfied on an accomplice liability basis. The accomplice testimony instruction gave the jury information to assist the jury in assessing the co-felon's testimony, but it did not inject an accomplice liability theory into the case.

The two references to an accomplice in the felony-murder instruction appear in a part of the instruction that explains the meaning of "in the course of" and "in furtherance of." Those sentences do not refer to the first element and do not appear to bear on or qualify the first element. They do not inform the jury that death caused by the accomplice could satisfy the first element of the offense. Nothing in the instructions informs the jury that the first element can be satisfied by anything other than the defendant's own conduct.

Having been instructed that it must find that each element of the offense was established beyond a reasonable doubt in order to find the defendant guilty, the jury, following the instructions as it is presumed to do, would have considered each element and determined whether each element was satisfied. I think the jury's finding on the first element, that the defendant, by his conduct, caused the death of Craig Melancon, must be interpreted as meaning that the jury found that the defendant fired the fatal shots. I would find that the references to the death being

caused by an accomplice are in connection with the third element only and are harmless error beyond a reasonable doubt, given the jury's finding on the first element.

Whether this Court, as composed at the time of the defendant's direct appeal, would have reversed the defendant's conviction on a plain error analysis of the instruction, had the problems with the instruction been raised on appeal, is speculation. Based on the facts presented, there is no way to know how the Court would have responded to the arguments the parties would have made in that proceeding.

I would affirm the judgment of the Superior Court.